1

2

3

4

5

6

7

8 **UNITED STATES DISTRICT COURT**

9 **CENTRAL DISTRICT OF CALIFORNIA**

10 **WESTERN DIVISION**

11

12 **NICOLE J. HARRIS,**                                    No.  CV 08-2726  AJW

13                 **Plaintiff,**

       **v.**

14                                                         **MEMORANDUM OF DECISION**

**MICHAEL J. ASTRUE,**

15 **Commissioner of the Social**
**Security Administration,**

16               **Defendant.**

17 _____

18       Plaintiff filed this action seeking reversal of the decision of defendant, the Commissioner of

19 the Social Security Administration (the "Commissioner"), denying plaintiff's application for

20 disability insurance benefits.  The parties have filed a Joint Stipulation ("JS") setting forth their

21 contentions with respect to each disputed issue.

22                                      **Administrative Proceedings**

23       The procedural facts are not disputed and are recited in the Joint Stipulation.  [See JS 2].

24 Plaintiff alleged that she became disabled July 29, 2003, due to right knee and joint pain. [JS 1; see

25 Administrative Record ("AR") 17-18].   In a written hearing decision dated October 12, 2006 that

26 constitutes the Commissioner's final decision, an administrative law judge (the "ALJ") found that

27 plaintiff retained the residual functional capacity ("RFC") to perform her past relevant work as a

28 purchasing clerk and a telemarketer. [AR 24-25].

**Standard of Review**

The Commissioner's denial of benefits should be disturbed only if it is not supported by substantial evidence or is based on legal error. Stout v. Comm'r Social Sec. Admin., 454 F.3d 1050, 1054 (9th Cir. 2006); Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002).  "Substantial evidence" means "more than a mere scintilla, but less than a preponderance." Bayliss v. Barnhart, 427 F.3d 1211, 1214 n.1 (9th Cir. 2005).  "It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005)(internal quotation marks omitted). The court is required to review the record as a whole and to consider evidence detracting from the decision as well as evidence supporting the decision. Robbins v. Soc. Sec. Admin, 466 F.3d 880, 882 (9th Cir. 2006); Verduzco v. Apfel, 188 F.3d 1087, 1089 (9th Cir. 1999). "Where the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld." Thomas, 278 F.3d at 954 (citing Morgan v. Comm'r of Soc. Sec. Admin., 169 F.3d 595, 599 (9th Cir.1999)).

**Discussion**

**Residual functional capacity**

Plaintiff contends that the ALJ erred because she failed to include the following limitations in her RFC finding: (1) plaintiff's need for a sit/stand option, as reflected in her subjective testimony and the opinion of Dr. Angerman, an agreed medical examiner in plaintiff's California workers' compensation case; (2) an impairment in plaintiff's concentration and memory; (3) her need to ambulate with a cane; (4) her need to remain close to a restroom; and (5) a preclusion from all postural activities. [See JS 4-10].

The ALJ found that plaintiff, who was then 33 years old, had severe impairments consisting of knee impairments, primarily on the right side, and obesity.[1] [AR 24].  The ALJ further found that plaintiff retained the RFC for sedentary work with no more that occasional postural activities, including stooping, bending, crawling, kneeling, crouching, and climbing, and that she should avoid

---

[1] Plaintiff was 67 inches tall, and weight measurements in the record ranged from 292 pounds in October 2003 to 350 pounds in April 2005. [AR 18].

1   walking on uneven surfaces.[2] [AR 18].

2        Plaintiff contends that "although the ALJ appeared to accept the plaintiff's testimony that

3   she cannot sit for more than 30 minutes intervals more than 5 times a week and can sit for up to 1

4   hour intervals twice a week (AR 19)," the ALJ did not include the need for a sit/stand option in

5   plaintiff's RFC. [JS 3].  Plaintiff's premise is faulty.  The ALJ noted plaintiff's testimony that she

6   could sit for at least the periods noted [AR 19], but she did not adopt plaintiffs testimony regarding

7   her subjective symptoms and limitations.[3] [AR 19-20, 24].

8        Plaintiff also argues that Dr. Angerman's opinion "indicates the need to have a sit/stand

9   option" because he opined that plaintiff would not be able to perform "prolonged standing or

10  walking," and the two hours of standing or walking required by sedentary work "may be considered

11  prolonged." [JS 2].  Plaintiff, however, misconstrues Dr. Angerman's opinion.

12       The ALJ concluded that Dr. Angerman's May 2005 permanent and stationary report, which

13  was issued after plaintiff underwent right knee arthroscopic surgery with right knee debridement in

14  November 2004, "supports the conclusion" that plaintiff could perform sedentary work with the

---

16       [2]      Under the Commissioner's regulations, sedentary work

17  involves lifting no more than 10 pounds at a time and occasionally lifting or carrying
18  articles like docket files, ledgers, and small tools.  Although a sedentary job is
    defined as one which involves sitting, a certain amount of walking and standing is
19  often necessary in carrying out job duties.  Jobs are sedentary if walking and
    standing are required occasionally and other sedentary criteria are met.
20
21  20 C.F.R §§404.1567(a), 416.967(a).

22  To perform the full range of sedentary work, a claimant must be able to lift up to ten pounds at a
23  time and must occasionally lift or carry articles like docket files, ledgers, and small tools.  Sedentary
    jobs involve walking and standing "occasionally," which means up to one-third of the time, typically
24  about two hours during an eight-hour workday.  Sitting is required for about six hours during an
    eight-hour workday.  Unskilled sedentary work also involves other "nonexertional" activities, such
25  as the capacity for seeing, manipulation of objects, and understanding, remembering, and carrying
    out simple instructions. By its very nature, work performed primarily in a seated position does not
26  entail significant stooping.  Most unskilled sedentary jobs require good use of the hands and fingers
27  for repetitive hand-finger actions. See 20 C.F.R. §§ 404.1567(a), 416.967(a); Social Security Ruling
    ("SSR") 96-9p, 1996 WL 374185, at *3; SSR 83-10, 1983 WL 31251, at *5.

28       [3]      The ALJ's credibility assessment is discussed below.

- 3 -

1    additional limitations found by the ALJ. [AR 22-23]. In that report, Dr. Angerman opined that

2    plaintiff required "prophylactic work restrictions" precluding her from, among other things,

3    "prolonged standing and walking." [AR 232, 242]. The definition of sedentary work contemplates

4    "occasional" standing or walking, meaning a *total* of about two hours standing and walking

5    throughout the course of an eight-hour work day. Plaintiff cites no authority for the proposition that

6    the need to avoid "prolonged" standing or walking bars her from standing and walking, in total, for

7    no more than two hours during an eight-hour day. Cf. Desrosiers v. Sec'y of Health & Human Serv.,

8    846 F.2d 573, 580 (9th Cir. 1988)(holding that a claimant who "can perform work that does not

9    require prolonged lifting, bending, stooping, pulling, pushing, or climbing, and does not require the

10   use of his left upper extremity above shoulder level" under the California workers' compensation

11   guidelines has limitations that "place him somewhere between light and sedentary work" as defined

12   by the Commissioner). Based on plaintiff's subjective complaints, Dr. Angerman classified her as

13   having "constant slight pain" in the right knee "on most occasions, becoming slight to moderate with

14   . . . prolonged standing and walking activities."[4] [AR 242]. He opined that plaintiff could not

15   perform what he understood to be the "frequent standing and walking" required in her past work and

16   opined that she was a candidate for vocational rehabilitation [AR 243], but he did not say that she

17   needed to be able to sit or stand at will.  Nothing in Dr. Angerman's report (or in the report of any

18   other treating or examining doctor) suggests that plaintiff could not perform occasional standing or

19   walking or required the ability to sit and stand at will.

20         Plaintiff also contends that the ALJ impermissibly excluded from his RFC finding "plaintiff's

21   impairment in concentration and memory, which she testified to and was noted in the records." [JS

22   4]. Plaintiff does not cite any testimony or medical reports in the record documenting an impairment

23   in memory and concentration, nor does she explain how any such impairment precluded her from

24   working. The ALJ noted that plaintiff had seen a psychologist for the first time on August 14, 2006,

25   about a month before the hearing. [AR 19, 289-290]. Plaintiff complained of anxiety and sadness.

26

27         [4]      While Dr. Angerman reported plaintiff's subjective complaints and limitations in
28   standing, walking, and sitting, he did not adopt her subjective limitations verbatim, as plaintiff seems
     to suggest, but rather classified them as quoted above. [Compare AR 223-224 with AR 242].

1  She had lost an infant daughter to SIDS (Sudden Infant Death Syndrome) in 2004. [AR 19, 289,

2  322]. Plaintiff reported that she had received an eviction notice and said that she and her husband

3  had physical problems. [AR 289]. No subjective complaints regarding concentration or memory

4  were noted. [AR 289]. On mental status examination, plaintiff exhibited an unspecified degree of

5  recent and remote memory impairment, but overall her examination revealed only "minimal

6  disturbance." [AR 289]. The ALJ observed that plaintiff had seen a Dr. Silver on September 7,

7  2006, the day before the hearing. [AR 17-18]. Dr. Silver's progress note indicates that plaintiff

8  complained of poor short-term memory and other problems, but no diagnosis or treatment is noted.

9  [AR 293]. The

10      In the absence of any evidence of a medically-determinable impairment in concentration or

11  memory, either severe or non-severe, the ALJ did not err in excluding such an impairment from his

12  RFC assessment. See 20 C.F.R. § 404.1545 ("We will consider all of your *medically determinable*

13  *impairments* of which we are aware, including your medically determinable impairments that are

14  not "severe," as explained in §§ 404.1520(c), 404.1521, and 404.1523, when we assess your residual

15  functional capacity.")(italics added).

16      Plaintiff next argues that the ALJ erred by excluding from her RFC finding plaintiff's need

17  to ambulate with a cane.  The ALJ recognized that in April 2005, Dr. Jackson, a workers'

18  compensation treating physician, gave plaintiff a cane "to decrease the force through the knee" after

19  plaintiff told him that she was seven weeks pregnant, and therefore was "off the Darvocet" she had

20  been taking for knee pain. [AR 22, 155]. The ALJ, however, determined that plaintiff's alleged

21  continued need for a cane did not decrease her RFC.

22      Plaintiff was ambulating with the cane during subsequent visits to Dr. Jackson in May 2005

23  and July 2005. [AR 153-154]. The ALJ noted that plaintiff was using the cane when she was last

24  examined by Dr. Angerman in May 2005. [AR 23, 224]. Plaintiff told Dr. Angerman that she had

25  been using the cane daily since Dr. Jackson "provided her with [it] for support while ambulating"

26  several weeks earlier, and that her right knee had not given way in the interim. [AR 224]. Dr.

27  Angerman completed a form endorsing plaintiff's need for a cane due to a moderate gait

28  derangement [AR 236-237], and he explicitly considered the effects of her antalgic gait in his

1    permanent and stationary report. [AR 232, 241].  Notwithstanding plaintiff's difficulty ambulating,

2    Dr. Angerman opined that plaintiff needed to avoid only "very heavy lifting," "prolonged standing

3    and walking," "repetitive or prolonged" postural activities, and walking on uneven surfaces. [AR

4    242-243].

5           When plaintiff returned to Dr. Jackson in March 2006 for a permanent and stationary

6    evaluation, Dr. Jackson concluded that plaintiff was restricted from "prolonged walking, standing,

7    squatting, kneeling, crawling, and climbing." [AR 284].  Dr. Jackson noted that "[w]e did an

8    arthroscopic surgery on her [right] knee in November of 2004  at which time it was noted she had

9    full- thickness articular cartilage loss, medial femoral condyle, and had full-thickness changes in the

10   femoral sulcus." [AR 284].   X-rays taken during the March 2006 office visit "suggest early

11   narrowing in the medial compartment of her knee and at the patellofemoral joint, there is slight

12   lateral tilt to the patella." [AR 285]. Dr. Jackson opined that plaintiff had a  "cartilage interval of 3

13   mm. which gives her a 3% whole person disability and a 7% lower extremity disability." [AR 285].

14   Dr. Jackson restricted plaintiff from "repeated squatting, kneeling, crawling, climbing, prolonged

15   walking, standing, repetitive pushing or pulling and repetitive lifting over 30 pounds." [AR 285].

16   He said that plaintiff was "medically eligible for vocational rehabilitation.  The weight-reduction

17   program is a major portion of her long-term management." [AR 285].  Dr. Jackson opined that

18   plaintiff would need future medical care entailing periodic visits to the physician and a knee

19   replacement that "hopefully" could wait "at least 10 to 20 years." [AR 285].  Dr. Jackson said

20   nothing about plaintiff's needing or using a cane at the time of that examination, nor did he suggest

21   that she would need a cane or other assistive device to ambulate in the future.

22          The ALJ reasonably inferred that since Dr. Jackson, who had prescribed the cane initially,

23   made no mention of plaintiff's using or needing a cane when he completed a permanent and

24   stationary evaluation in March 2006, plaintiff did not have continued medical need for a cane. [AR

25   23]. In addition, the ALJ correctly observed that both Dr. Jackson and Dr. Angerman opined that

26   notwithstanding her knee and gait problems, plaintiff could work with restrictions against prolonged

27   standing and walking, repetitive or prolonged postural activities, and very heavy lifting, and they

28   did not specify the use of a cane or other assistive device in their work restrictions. [AR 23]. See

1    SSR 96-9p, 1996 WL 374185, at *7 ("To find that a hand-held assistive device is medically

2    required, there must be medical documentation establishing the need for a hand-held assistive device

3    to aid in walking or standing, and describing the circumstances for which it is needed (i.e., whether

4    all the time, periodically, or only in certain situations; distance and terrain; and any other relevant

5    information)."). In addition, the ALJ noted that Dr. Moses, the Commissioner's consultative

6    orthopedist, opined that plaintiff could stand and walk for four hours and sit for up to six hours in

7    an eight-hour work day notwithstanding her use of a cane. [AR 23, 245-249]. The ALJ's

8    interpretation of the evidence was reasonable.[5]

9           Finally, plaintiff argues that the ALJ's rationale was internally inconsistent because the ALJ

10   rejected Dr. Moses's conclusion that plaintiff could not do any climbing, stooping, kneeling, or

11   crouching, yet the ALJ "stated that she allowed for greater limitations than Dr. Moses allowed." [AR

12   9]. What the ALJ actually said is that by restricting plaintiff to lifting and carrying no more than 10

13   pounds and standing or walking two hours in an eight-hour day, the ALJ "allowed for greater

14   *exertional* restrictions than Drs. Angerman and Moses . . . ." [AR 23]. Postural limitations are

15   nonexertional limitations, so the ALJ's statement was not inconsistent, nor was it improper for her

16   to rely on the consistent treating and examining source opinions to conclude that plaintiff could

17   occasionally engage in postural activities.

18          For all of these reasons, plaintiff's contentions regarding errors in the ALJ's RFC assessment

19   lack merit.

20          **Subjective complaints**

21          Plaintiff argues that the ALJ failed properly to evaluated plaintiff's subjective complaints.

22   _____

23          [5]     Even when medically required, the use of a cane does not rule out the ability to
     perform sedentary work. See SSR 96-9p, 1996 WL 374185, at *7 (explaining that "if a medically
24   required hand-held assistive device is needed only for prolonged ambulation, walking on uneven
     terrain, or ascending or descending slopes, the unskilled sedentary occupational base will not
25   ordinarily be significantly eroded," and that "an individual who must use a hand-held assistive
     device to aid in walking or standing because of an impairment that affects one lower extremity (e.g.,
26   an unstable knee), or to reduce pain when walking, who is limited to sedentary work because of the
     impairment affecting the lower extremity, and who has no other functional limitations or restrictions
27   may still have the ability to make an adjustment to sedentary work that exists in significant
     numbers").
28

1  [See JS 10-15].

2      Once a disability claimant produces evidence of an underlying physical or mental

3  impairment that is reasonably likely to be the source of his or her subjective symptoms, the

4  adjudicator is required to consider all subjective testimony as to the severity of the symptoms.

5  Moisa v. Barnhart, 367 F.3d 882, 885 (9th Cir. 2004); Bunnell v. Sullivan, 947 F.2d 341, 345 (9th

6  Cir. 1991) (en banc); see also 20 C.F.R. §§ 404.1529(a), 416.929(a) (explaining how pain and other

7  symptoms are evaluated).   Although the ALJ may then disregard the subjective testimony she

8  considers not credible, she must provide specific, convincing reasons for doing so. Tonapetyan v.

9  Halter, 242 F.3d 1144, 1148 (9th Cir. 2001); see also Moisa, 367 F.3d at 885 (stating that in the

10  absence of evidence of malingering, an ALJ may not dismiss the subjective testimony of claimant

11  without providing "clear and convincing reasons").   The ALJ's credibility findings "must be

12  sufficiently specific to allow a reviewing court to conclude the ALJ rejected the claimant's testimony

13  on permissible grounds and did not arbitrarily discredit the claimant's testimony." Moisa, 367 F.3d

14  at 885; see Light v. Social Sec. Admin., 119 F.3d 789, 792 (9th Cir. 1997) (enumerating factors that

15  bear on the credibility of subjective complaints); Fair v. Bowen, 885 F.2d 597, 604 n.5 (9th Cir.

16  1989)(same).  If the ALJ's assessment of the claimant's testimony is reasonable and is supported by

17  substantial evidence, it is not the court's role to "second-guess" it. Rollins v. Massanari, 261 F.3d

18  853, 857 (9th Cir. 2001).

19      During the hearing, plaintiff testified that before and after her knee surgery, she had "the

20  same amount of pain.  I still cannot crouch. I have difficulty walking. I have difficulty sitting for a

21  long period of time. I have to keep my knees – my knee elevated.  I sleep with a pillow underneath

22  my knee to keep it elevated.  I can't squat. I can't pivot." [AR 316].  She said she always carried

23  with her the cane prescribed by Dr. Jackson.  She complained of back spasms, headaches, diarrhea,

24  and difficulty rising from a sitting to a standing position. [AR 323-324].

25      The ALJ made specific findings based on substantial evidence supporting her conclusion that

26  plaintiff's subjective complaints of disabling pain and limitations were not fully credible and did not

27  prevent her from performing sedentary work.  The ALJ noted that treating and examining doctors

28  who evaluated plaintiff's subjective complaints of knee pain, weakness, and swelling, including Drs.

Angerman, Jackson, and Moses, did not consider her subjective symptoms totally disabling. See Light, 119 F.3d at 792 (stating that the ALJ may consider information from physicians regarding the nature and effect of a claimant's symptoms). The ALJ remarked that plaintiff's pregnancies in 2003 and 2005 accounted in part for her subjective limitations during the alleged disability period. For example, her doctors noted that her right knee symptoms were exacerbated by gestational weight gain, that she was limited to over-the-counter acetaminophen for pain management during pregnancy, and that certain diagnostic procedures could not safely be performed until after her pregnancy. [E.g., AR 154-156, 170, 178, 186, 206]. The ALJ noted that after her pregnancy ended, plaintiff had not undergone aggressive treatment for knee problems and had not even been taking medication since at least the middle of 2005, more than a year before the hearing. See Orteza v. Shalala, 50 F.3d 748, 750 (9th Cir. 1995) (per curiam) (holding that the ALJ properly pointed to the fact that the claimant did not require prescription pain medication). Plaintiff testified that one day before the September 8, 2006 hearing, she had seen a doctor who prescribed Topamax and diagnosed fibromyalgia, but that testimony is not corroborated by the doctor's one page treatment note. [AR 19, 224, 245, 314].

The ALJ gave specific, clear, and convincing reasons supported by the record for her credibility assessment, and she did not arbitrarily discredit plaintiff's testimony.

**Past relevant work**

Plaintiff contends that the ALJ erred in determining that plaintiff could perform her past relevant work because the ALJ did not accurately characterize her past relevant work as actually or generally performed.

A claimant is "not disabled" if he or she retains the residual functional capacity to perform the "actual functional demands and job duties of a particular past relevant job" or the "functional demands and job duties of the occupation as generally required by employers throughout the national economy." Pinto v. Massanari, 249 F.3d 840, 845 (9th Cir. 2001) (quoting Social Security Ruling ("SSR") 82-62); see also Burch, 400 F.3d at 679; Villa v. Heckler, 797 F.2d 794, 798 (9th Cir. 1986) ("The claimant has the burden of proving an inability to return to his former type of work and not just to his former job."). Information from the Dictionary of Occupational Titles ("DOT")

1  or the testimony of a vocational specialist, may be used to ascertain the demands of an occupation

2  as ordinarily required by employers throughout the national economy.  SSR 82-61, 1982 WL 31387,

3  at *2; Villa, 797 F.2d at 798.  Regardless of which source of job information is used, the ALJ is

4  required to make "specific findings as to the claimant's residual functional capacity, the physical

5  and mental demands of the past relevant work, and the relation of the residual functional capacity

6  to the past work."  Pinto, 249 F.3d at 845 (citing SSR 82-62).

7  Where the ALJ's step-four finding rests on a determination that the claimant can perform her

8  past relevant work "as generally performed," rather than as actually performed in a particular past

9  job, the DOT or a vocational expert must be consulted to determine the "functional demands and job

10  duties of the occupation as generally required by employers throughout the national economy."

11  Pinto, 249 F.3d at 845-846.  If the ALJ wishes to rely on a vocational expert's testimony, the

12  "vocational expert merely has to find that a claimant can or cannot continue his or her past relevant

13  work as defined by the regulations ...."  Pinto, 249 F.3d at 845.  Even with such vocational expert

14  testimony, however, the ALJ is not "in any way relieved of his burden to make the appropriate

15  findings to insure that the claimant really can perform his or her past relevant work."  Pinto, 249 F.3d

16  at 845.

17  Plaintiff described her primary past job as an "expeditor/account representative - purchasing"

18  in "hotel purchasing corporate office." [AR 130, 134].  On her vocational report, plaintiff said that

19  her job involved "coordinating and tracking of hotel mdse. for hotel renovations or grand openings,"

20  "managing 200+ hotel proj. and oper. accounts for the Hilton Hotels Corp.," and being "the

21  customer service contact for my hotels." [AR 134]. As described by plaintiff, her job corresponded

22  to medium work because she spent as much as four to five hours a day standing or walking and was

23  sometimes required to lift and carry file boxes weighing 50 or 60 pounds. [AR 134].  Asked about

24  that job during the hearing, she explained that she worked in "customer service" for Hilton Hotels

25  in a position that required her to oversee over 200 Hilton Garden Inn accounts and troubleshoot a

26  variety of problems between individual hotels and the Hilton Hotels corporation in areas such as

27  purchasing, shipping, and accounting. [AR 317]. She said that her job involved lifting heavy file

28  boxes and often getting out of her chair to visit other departments. [AR 317-318].          T h e

vocational expert classified plaintiff's past work as a "purchasing clerk," <u>DOT</u> job number 249-367.066 (procurement clerk).[6] [AR 24, 150, 326].  The vocational expert testified that job was "probably the closest to what [plaintiff] was doing," but she acknowledged that there was "a variety of skills built into the job that [plaintiff] was doing," including accounts receivable, payroll, and other "different things." [AR 326].  The <u>DOT</u> job of procurement clerk is classified as sedentary work, while plaintiff's past work for Hilton Hotels as she described it was heavy work. [<u>See</u> AR 150].

The ALJ found that the vocational expert's testimony was consistent with the <u>DOT</u> and accurately described plaintiff's past work as generally performed. [AR 24]. That finding cannot be reconciled with the vocational expert's qualified, equivocal testimony nor with the <u>DOT</u> description of the job of procurement clerk, whose title and job duties are not a good match for the job plaintiff described in her vocational reports and testimony.

The Commissioner has cautioned that "finding that a claimant has the capacity to do past relevant work on the basis of a generic occupational classification of the work is likely to be fallacious and unsupportable."  <u>Pinto</u>, 249 F.3d at 846 (quoting SSR 82-61). Jobs within a generic

---

[6] The job of procurement clerk is classified in the <u>DOT</u> as follows:

Compiles information and records to prepare purchase orders for procurement of material for industrial firm, governmental agency, or other establishment: Verifies nomenclature and specifications of purchase requests. Searches inventory records or warehouse to determine if material on hand is in sufficient quantity. Consults catalogs and interviews suppliers to obtain prices and specifications. Types or writes invitation-of-bid forms and mails forms to supplier firms or for public posting. Writes or types purchase order and sends copy to supplier and department originating request. Compiles records of items purchased or transferred between departments, prices, deliveries, and inventories. Computes total cost of items purchased, using calculator. Confers with suppliers concerning late deliveries. May compare prices, specifications, and delivery dates and award contract to bidders or place orders with suppliers or mail order firms. May verify bills from suppliers with bids and purchase orders and approve bills for payment. May classify priority regulations.

1   job classification "may have a common characteristic," but "often involve quite different functional

2   demands and duties requiring varying abilities and job knowledge." Pinto, 249 F.3d at 846 (quoting

3   SSR 82-61). Moreover, "[a] particular job may or may not be identifiable in authoritative reference

4   materials. The claimant is in the best position to describe just what he or she did in [past relevant

5   work] how it was done, what exertion was involved, what skilled or semiskilled work activities were

6   involved, etc. Neither an occupational title by itself nor a skeleton description is sufficient." SSR

7   82-41, 1982 WL 31389, at *4.

8           Neither the vocational expert's testimony nor the DOT description of the job of

9   "procurement clerk" accurately portray the nature of the work plaintiff performed for Hilton Hotels

10  as described in her reports and testimony.  A claimant's past job as actually performed may involve

11  "functional demands and job duties significantly in excess of those generally required for the job

12  by other employers throughout the national economy," and the claimant who can perform the less

13  demanding version of the job generally required by employers is not disabled. See SSR 82-61, 1982

14  WL 31387, at *2.  The distinction here, however, is not merely a matter of degree but a matter of

15  kind.  Accordingly, substantial evidence does not support the ALJ's finding that plaintiff had past

16  relevant work as a procurement clerk.

17          The ALJ's finding that plaintiff had past relevant work as a telemarketer (DOT job number

18  299.357-014) is flawed as well. To qualify as a past relevant work, a past job must be "substantial

19  gainful activity." See 20 C.F.R. §§ 404.1571 et seq., §§ 416.971 et seq. The job of telemarketer has

20  a "Specific Vocational Preparation" of "Level 3," meaning that it generally takes "over 1 month up

21  to and including 3 months" to learn the job.[7] Plaintiff's vocational report states that she performed

22  that job from "11/97" to "12/97." [AR 130].  On her benefits application, plaintiff said that she

23  worked only "a few days" in 1997, for a temporary agency, and was unemployed the rest of the year.

24  [AR 69].   Her earnings record shows earnings of only $441.85 for 1997. [AR 101]. The record

25  _____

26          [7] The term "Specific Vocational Preparation" is a term of art used in the DOT to classify "how long it generally takes to learn the job." See 20 C.F.R. §§ 404.1468(a), 416.968(a); Terry v.

27  Sullivan, 903 F.2d 1273, 1276 (9th Cir. 1990); see generally DOT, Appendix C, "Components of the Definition Trailer" (4th ed. 1991).

28

1   demonstrates that plaintiff did not hold the job of telemarketer long enough to qualify as "substantial

2   gainful activity." See Gatliff v. Comm'r of Social Sec. Admin., 172 F.3d 690, 694 (9th Cir. 1999)

3   (holding that "substantial gainful activity means more than merely the ability to find a job and

4   physically perform it; it also requires the ability to hold the job for a significant period of time," and

5   that two months is not a significant period of time).

6          For these reasons, the ALJ's finding that plaintiff was not disabled because she could

7   perform her past relevant work is not supported by substantial evidence. The ALJ, however, made

8   an alternative finding that plaintiff could perform alternative work.

9          **Alternative work**

10         Plaintiff contends that plaintiff's nonexertional impairments preclude the ALJ's reliance on

11  the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2 (the "grids"), to

12  support his finding that plaintiff's RFC does not preclude performance of jobs available in

13  significant numbers in the national economy. [JS 20-22].

14         The ALJ found that even if plaintiff's past relevant work was ruled out, plaintiff "is a

15  younger individual, and as sedentary jobs by their nature do not require more than occasional

16  postural maneuvers (or walking on uneven surfaces)," plaintiff was "not disabled" under Rules

17  201.21 and 201.22 of the grids. [AR 24].

18         At step five, the Commissioner has the burden to establish that there are a significant number

19  of jobs in the national economy that the claimant can perform.  The Commissioner may meet the

20  burden by taking the testimony of a vocational expert, or by referring to the grids. Tackett v. Apfel,

21  180 F.3d 1094, 1100-1101 (9th Cir. 1999). The grids may be used when the claimant's non-

22  exertional limitations do not significantly affect his exertional capabilities.  On the other hand, when

23  a claimant's non-exertional limitations significantly limit the range of work permitted by the

24  claimant's exertional limitations, then use of the grids to find him not disabled is inappropriate.

25  Tackett, 180 F.3d at 1101-1102; see  Bruton v. Massanari, 268 F.3d 824, 827-828 (9th Cir. 2000).

26         For the reasons already described, the ALJ properly assessed plaintiff's RFC and did not err

27  in excluding additional nonexertional limitations, such as the need to alternate sitting and standing

28  at will. The ALJ reasoned that plaintiff's nonexertional limitations restricting her to only occasional

1  postural maneuvers or walking on uneven surfaces do not significantly erode the sedentary

2  occupational base and do not preclude application of the grids.  That determination is consistent with

3  the Commissioner's policy guidelines.  See SSR 96-9p, 1996 WL 374185, at *7 (stating that

4  "[p]ostural limitations or restrictions related to such activities as climbing ladders, ropes, or

5  scaffolds, balancing, kneeling, crouching, or crawling would not usually erode the occupational base

6  for a full range of unskilled sedentary work significantly because those activities are not usually

7  required in sedentary work," and that a restriction to occasional stooping should no more than

8  "minimally erode" the unskilled sedentary occupational base).

9      Accordingly, the ALJ did not err in applying the grids to conclude, in the alternative, that

10  plaintiff was disabled at step five of the sequential evaluation.

11      **Development of the record**

12      Plaintiff contends that the ALJ erred in failing to develop the record further in response to

13  plaintiff's statements to Dr. Moore, the psychologist plaintiff saw in August 2006, and Dr. Silver,

14  a physician plaintiff saw in September 2006, that she had been depressed since the death of her

15  daughter in October 2004, but had been unable to afford mental health treatment. [JS 22-24].

16      The ALJ reviewed the treatment notes from Drs. Moore and Silver along with plaintiff's

17  other medical records. The ALJ acknowledged that plaintiff understandably experienced grief at the

18  loss of her child, but also noted that plaintiff did not allege disability due to mental problems, and

19  that the medical evidence did not document complaints of emotional problems or mental

20  abnormalities prior to plaintiff's visits to Dr. Moore and Dr. Silver shortly before the hearing. [AR

21  19].  The ALJ further noted that Dr. Moore indicated the existence of a "minimal disturbance" based

22  on plaintiff's mental status examination results. Dr. Moore gave plaintiff a current Global

23  Assessment of Function ("GAF") score of 31 [AR 290]; however, that score is not a straightforward

24  measure of plaintiff's level of mental impairment.  Instead, it reflects a judgment about plaintiff's

25  "overall level" of psychological, social, and occupational functioning, including her "morbid

26

27

28

1  obesity," "economic [and] family stressors," and "complicated bereavement."[8] [AR 290].

2       The ALJ's "duty to develop the record further is triggered only when there is ambiguous

3  evidence or when the record is inadequate to allow for proper evaluation of the evidence." Mayes

4  v. Massanari, 276 F.3d 453, 459-460 (9th Cir. 2001). Given the absence of any mental health

5  evaluations or treatment predating the reports of Drs. Moore and Silver, the evidence was not

6  ambiguous and the record was adequate. Therefore, the suggestion that the ALJ breached her duty

7  to develop the record lacks merit.

8                                **Conclusion**

9       For the reasons stated above, the Commissioner's decision is supported by substantial

10 evidence and reflects application of the proper legal standards.  Accordingly, defendant's decision

11 is **affirmed.**

12

13 **IT IS SO ORDERED.**

14

15 DATED: September 8, 2009



16

17                               _____

18                               ANDREW J. WISTRICH
                                 United States Magistrate Judge

19

20 _____

21      [8]    The GAF score is a "multiaxial" assessment that reflects a clinician's subjective

22 judgment of a patient's overall level of functioning by asking the clinician to rate two components:
   the severity of a patient's psychological symptoms, or the patient's psychological, social, and

23 occupational functioning.  The GAF score is the lower of the symptom severity score or the
   functioning severity score.  A GAF score of 31 through 40 signifies some impairment in reality

24 testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major
   impairment in several areas, such as work or school, family relations, judgment, thinking, or mood

25 (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats
   up younger children, is defiant at home, and is failing at school).  See American Psychiatric

26 Association, Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition Multiaxial

27 Assessment, 27-36 (rev. 2000)); see also Vargas v. Lambert, 159 F.3d 1161, 1164 (9th Cir.
   1998)(describing a GAF score as "a rough estimate of an individual's psychological, social, and

28 occupational functioning used to reflect the individual's need for treatment").